# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| PATRICIA HARRIS, | ) |
| Plaintiff, | ) |
| v. | ) No. 18-00424-CV-W-BP |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT IN FAVOR OF PLAINTIFF

This is a medical malpractice, wrongful death lawsuit brought by Plaintiff Patricia Harris ("Plaintiff" or "Mrs. Harris") on behalf of the heirs of Gilbert Harris ("Mr. Harris" or "decedent") against Defendant United States of America ("Defendant") under the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. §§ 2671, *et seq.*[1] The Court conducted a bench trial on the wrongful death claim from December 9, 2019 through December 11, 2019. Before the presentation of evidence, the parties stipulated to certain facts (Doc. 60) and to the admissibility of certain evidence (Doc. 61). The Court heard from eleven witnesses (live and by deposition) as well as counsel's arguments.

In general, Plaintiff argued that Defendant failed to properly place a Foley catheter on May 12, 2016, during a visit to the urology clinic at the Kansas City VA Medical Center ("KC VAMC"). This failure allegedly caused Mr. Harris to develop sepsis and die on May 26, 2016. Specifically, Plaintiff alleged that a Foley catheter balloon, used to keep the catheter in place, was improperly inflated in Mr. Harris' urethra instead of his bladder. This improper placement caused urethral

---

[1] Plaintiff originally brought two claims under the FTCA -- a wrongful death claim and a lost chance of survival claim. (Doc. 1.) The Court dismissed the lost chance of survival claim for lack of subject matter jurisdiction on November 1, 2018. (Doc. 20.)

trauma resulting in sepsis, which ultimately caused or contributed to cause Mr. Harris' death on May 26, 2016.

Plaintiff argued that Defendant's negligence caused the decedent significant pain and suffering from May 12 through May 26, 2016. Plaintiff also presented evidence that Defendant's negligence caused and continues to cause pain and suffering to the decedent's surviving family members. Damages were not disputed at trial. The evidence showed that Mr. Harris died a painful death, and that his family suffered a significant loss.

Defendant did not dispute that it would be below the standard of care to inflate the balloon in Mr. Harris' urethra. However, Defendant argued that the balloon was not inflated in the urethra but migrated there sometime between the placement of the Foley catheter and its discovery in the urethra approximately 12 hours later. Defendant also argued that (1) the cause of Mr. Harris' sepsis could have been from something other than urethral trauma, and (2) the family could have prevented the decedent's death by making different treatment decisions.

Defendant's contentions are not supported by the record. The evidence shows that more likely than not the balloon was negligently inflated in Mr. Harris' urethra during the Foley catheter placement. The evidence further shows that this negligence caused trauma which led to the development of sepsis and caused Mr. Harris' death. Finally, the record does not support a finding of any intervening cause. For these reasons, and as further set forth below, the Court enters judgment in favor of Plaintiff.

## I. FINDINGS OF FACT

After considering the governing law, the evidence, and the parties' arguments, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The following facts have been established by a preponderance of the evidence,

2

and any conflicts in the evidence have been resolved consistently with these findings. To the extent any findings of fact also constitute legal conclusions, they should be construed as such.

1. This medical malpractice lawsuit is brought by Plaintiff against Defendant under the FTCA. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 1.

2. This lawsuit is prosecuted in substance under the Missouri wrongful death statute, codified at Mo. Rev. Stat. § 537.080. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 2.

3. Prior to filing the Complaint, Plaintiff submitted an administrative tort claim to the Department of Veterans Affairs alleging a wrongful death claim and exhausted her administrative remedies.

4. Jurisdiction and venue are proper in the United States District Court for the Western District of Missouri.

5. Mrs. Harris is the surviving spouse of Mr. Harris, and Courtney Robinson is the surviving daughter of Mr. Harris. Mr. Harris was also survived by his parents, Gilbert G. and Rhoda Harris, but his mother has since passed away. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 3.

6. Beginning on July 11, 2014, Mr. Harris resided at Medicalodges Nevada ("Medicalodges"), a skilled nursing facility in Nevada, Missouri. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 4.

7. Mr. Harris' prior medical history included, in part, relapsing-remitting multiple sclerosis, traumatic brain injury, and neurogenic bladder. In general, a neurogenic bladder indicates lack of bladder control. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 5.

8. On April 22, 2016, Medicalodges contacted the urology clinic at the KC VAMC to request an appointment in order to change the Foley catheter placed by Medicalodges. Mr. Harris'

appointment was scheduled for 11:30 a.m. on May 12, 2016. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 10.

9. On the morning of Thursday, May 12, 2016, Tamarra Butcher (a Medicalodges employee) drove Mr. Harris to the KC VAMC for his appointment at the urology clinic. At the time, Ms. Butcher was a Certified Nursing Assistant at Medicalodges. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 11.

10. Mrs. Harris met Mr. Harris and Ms. Butcher at the KC VAMC for the urology clinic visit.

11. Upon presentation to the urology clinic, Colleen Cernich, P.A. (a KC VAMC employee) evaluated Mr. Harris. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 13.

12. P.A. Cernich was not present for the catheter exchange. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 14.

13. During the May 12, 2016 urology appointment, an unidentified KC VAMC nurse removed Mr. Harris' indwelling Foley catheter and inserted a new indwelling penile Foley catheter. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 15.

14. Other than the unknown KC VAMC nurse and the decedent, Ms. Butcher was the only witness to the Foley catheter exchange.

15. Ms. Butcher observed Mr. Harris yell out during the placement of the Foley catheter at the urology clinic.

16. Mrs. Harris, who had stepped out of the room during the Foley catheter exchange, also heard Mr. Harris yell out during placement of the catheter.

17. A patient is typically laid down in the supine position during placement of a Foley catheter. The KC VAMC nurse did not place Mr. Harris in the supine position for the catheter exchange.

18. KC VAMC policies and procedures state that a patient's vital signs should be recorded. KC VAMC nurses did not record Mr. Harris' vital signs.

19. The record does not show any attempt to verify the position of the Foley catheter once Mr. Harris yelled out.

20. The record does not contain evidence of a urine return in the catheter upon initial placement of the Foley catheter.

21. Ms. Butcher noticed blood in the Foley catheter bag and at the tip of Mr. Harris' penis at the completion of the catheter placement by the KC VAMC nurse.

22. Ms. Butcher raised concerns about the blood to the unknown KC VAMC nurse, but there is no evidence that these concerns were addressed.

23. The visit to the KC VAMC urology clinic concluded sometime between 1:00 p.m. and 1:30 p.m.

24. During the placement of Mr. Harris' Foley catheter on May 12, 2016, the KC VAMC, by and through its agents and employees, inflated the Foley catheter balloon in Mr. Harris' urethra. This caused significant trauma to Mr. Harris' urethra.

25. The inflation of the Foley catheter balloon in Mr. Harris' urethra was below the standard of care.

26. Following the Foley catheter exchange, Ms. Butcher took Mr. Harris back to a transport van to return him to Medicalodges.

27. Mr. Harris remained in significant pain upon arriving at the transport van. Ms. Butcher observed continued blood in the Foley catheter and at the tip of Mr. Harris' penis at the time they left the KC VAMC.

28. Ms. Butcher and Mr. Harris arrived back at Medicalodges around 3:15 p.m. on May 12, 2016. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 16.

29. Upon returning to Medicalodges it was noted that the Foley catheter bag contained no urine despite having been in place for approximately two hours. The Foley catheter bag is documented by Medicalodges as only containing blood and blood clots. (Defendant Exhibit 124.)

30. At this time Medicalodges also noted that the Foley catheter was only draining blood and Mr. Harris continued to be in pain.

31. Medicalodges then flushed Mr. Harris' Foley catheter. A small amount of urine and blood mix drained into the Foley catheter bag. It is likely that this small amount of urine had drained from the bladder into the urethra, and was now being flushed out.

32. Around 3:45 p.m., Amy Bauer (a Medicalodges nurse) checked on Mr. Harris and noted that he was pulling on the catheter. Following this, Medicalodges staff assisted Mr. Harris to the dining room for dinner.

33. Mr. Harris continued to deteriorate to the point that he became pale and began shaking.

34. A physician was called and around 5:31 p.m., Medicalodges called the Vernon County Ambulance District to transport Mr. Harris to the ER. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 17.

35. Around 5:54 p.m., the ambulance transporting Mr. Harris arrived at the ER of Nevada Regional Medical Center ("NRMC"). Stipulation of Uncontroverted Facts, Doc. 60, ¶ 18.

6

36. Upon initial examination, the emergency room physician at NRMC noted that Mr. Harris had gross blood in his briefs and frank blood in his catheter. The physician did not note any urine in Mr. Harris' catheter at 6:00 p.m. even though it had been placed approximately 5 hours earlier.

37. NRMC stabilized Mr. Harris. Around 7:21 p.m., NRMC decided to transport Mr. Harris to the KC VAMC. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 19.

38. Mr. Harris was diagnosed with sepsis while at NRMC's ER. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 20.

39. Around 9:55 p.m., NRMC called the Vernon County Ambulance District to transport Mr. Harris to the KC VAMC. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 21.

40. Around 11:46 p.m., the ambulance transporting Mr. Harris arrived at the ER of the KC VAMC. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 22.

41. Upon presentation to the emergency room at the KC VAMC, Mr. Harris was evaluated and admitted to the ICU. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 23.

42. Around 1:07 a.m. on May 13, 2016, approximately 12 hours after Mr. Harris' Foley catheter had been placed in the urology clinic at the KC VAMC, the KC VAMC performed a computerized tomography ("CT") scan of Mr. Harris' abdomen and pelvis. The CT scan showed an inflated Foley catheter balloon within Mr. Harris' penile urethra. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 24.

43. Based on the CT scan, the KC VAMC decided to remove Mr. Harris' catheter.

44. Shortly thereafter, the KC VAMC removed and replaced Mr. Harris' catheter with another Foley catheter. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 25.

45. While at the KC VAMC, Mr. Harris was diagnosed with urosepsis. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 27.

46. The KC VAMC presented Mrs. Harris and Courtney Robinson with the option of stopping treatment and providing Mr. Harris with palliative care/hospice care. This option had never been presented to the Harris family until Mr. Harris became septic.

47. On May 14, 2016, Mrs. Harris and Courtney Robinson, in consultation with KC VAMC physicians, elected to withdraw Mr. Harris' medical care and treatment and transfer Mr. Harris to palliative care/hospice care. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 28.

48. On May 16, 2016, Mr. Harris was transferred back to Medicalodges for such care. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 29.

49. Mr. Harris died a painful death as his body was overtaken by the infection.

50. Mr. Harris died on May 26, 2016 from sepsis at the age of 51. Stipulation of Uncontroverted Facts, Doc. 60, ¶ 30.

51. During the relevant time period, Colleen Cernich, P.A., Micah Pescetto, D.O., Bakul Sangani, M.D., and the unidentified KC VAMC nurse who replaced Mr. Harris' Foley catheter on May 12, 2016, were federal employees acting within the scope of their employment with the U.S. Department of Veterans Affairs.

## II. CONCLUSIONS OF LAW

The FTCA waives the federal government's sovereign immunity and grants federal district courts jurisdiction over claims:

> [F]or injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

8

28 U.S.C. § 1346(b)(1); *Sheridan v. United States*, 487 U.S. 392, 398 (1988) (citing 28 U.S.C. § 1346(b)). The conduct at issue occurred in Missouri, such that Missouri substantive law applies. *Id.; see also LaFond v. United States*, 781 F.2d 153, 154 (8th Cir. 1986).

In Missouri, the required elements to prevail on a wrongful death medical malpractice claim include proving that the defendant failed to meet a required medical standard of care, that the act or omission was performed negligently, and that the defendant's acts or omissions caused the decedent's death. *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 554 (Mo. banc 2008). As explained below, Plaintiff has met her burden of establishing the elements of a medical negligence wrongful death case in Missouri. In reaching this conclusion, the Court has weighed the parties' respective expert witnesses and gives more weight to Plaintiff's expert witnesses.

## **Standard of Care and Negligence**

It is uncontroverted that it would be below the standard of care to inflate the Foley catheter balloon in Mr. Harris' urethra. At trial, the evidence established that the KC VAMC inflated the balloon in his urethra at the scheduled urology visit on May 12, 2016. The KC VAMC has no documentation of details of the catheter placement and cannot identify who performed the Foley catheter exchange.

At trial, Ms. Butcher's testimony was the only evidence of what happened during the Foley catheter placement. The Court finds Ms. Butcher's testimony to be credible for several reasons, including her demeanor while testifying, the amount of detail provided in her testimony, the lack of a motive for her to testify a certain way, and because her testimony is supported by other credible evidence.

The Court finds that Ms. Butcher was in the room at the time of the catheter placement. Her testimony established that the KC VAMC staff who exchanged the Foley catheter did not

9

follow proper protocols. Those protocols include lying the patient down in the supine position and observing a urine return during placement. Moreover, Ms. Butcher saw blood instead of urine in the Foley catheter at the time of placement. Ms. Butcher also saw blood at the tip of Mr. Harris' penis. Ms. Butcher also recalled Mr. Harris yelling out in pain at the time of the catheter placement. Taken together, these facts lead the Court to conclude that the balloon was improperly inflated in Mr. Harris' urethra.

It is also undisputed that the balloon was found in the urethra around 1:00 a.m. on May 13, 2016. Defendant argues that the balloon could have migrated into the urethra on nine different occasions over a 12 hour period after the initial placement. However, Defendant's experts provide insufficient explanation for their opinions on when the balloon became dislodged. Both Dr. Curry and Dr. Canter testified that a patient who has a balloon in his urethra would experience pain. However, the records establish that Mr. Harris only expressed pain during the Foley catheter placement at KC VAMC. One of Defendant's experts, Dr. Scott Curry, suggested the balloon may have migrated at 3:45 p.m. He based this opinion primarily on a nursing note which states "it was noted that [Mr. Harris] was pulling on catheter." (Defendant Exhibit 124.) However, the record does not indicate Mr. Harris expressed any pain at 3:45 p.m. or anytime thereafter. Rather, the evidence establishes that Mr. Harris' pain and bleeding started long before Mr. Harris arrived back at Medicalodges. In addition to Ms. Butcher's testimony, the medical record states that the Foley catheter bag contained only bright red blood and blood clots upon his arrival back to Medicalodges. (*Id.*)

Another of Defendant's experts, Dr. Daniel Canter, testified that he believed the balloon did not enter the urethra until 10:00 p.m. or later, during the transport from NRMC to KC VAMC.

10

However, this is long after Mr. Harris had experienced significant bleeding, pain, and been diagnosed with sepsis. Further, there is no evidence of displacement during the transport.

In addition, Dr. Canter's testimony about when the balloon became dislodged is inconsistent with his expert report. Contrary to his testimony, Dr. Canter's expert report opined that "[a] more likely explanation is that Mr. Harris inadvertently pulled his Foley catheter balloon back into his prostatic urethra (or even his penile urethra) at the time when he 'pulled on' his catheter before and/or around 3:45 p.m." Based on the record as a whole, the Court gives little weight to the opinions of Dr. Curry and Dr. Canter.

Defendant further argued it was unlikely that the balloon was inflated in Mr. Harris' urethra during the KC VAMC urology clinic visit because Ms. Butcher stopped for something to eat and drink on the return trip to Medicalodges. If this event occurred, it does not make it more or less likely that the balloon was inflated negligently. One of Defendant's experts testified he believes the balloon was likely pulled down at Medicalodges around 3:45 p.m., and yet Medicalodges transferred Mr. Harris to dinner after that time. The timing of attempting to eat is not an indicator of when the balloon caused trauma to the urethra.

For these reasons, the most likely time that the balloon became lodged in Mr. Harris' urethra is when his unrelenting pain started, and when his bleeding began and never stopped. Based on the evidence presented, it is more likely than not that this time is when the Foley catheter was placed at the KC VAMC urology clinic.

## Causation

The evidence also establishes that Defendant's negligence – inflating the balloon in the urethra – caused Mr. Harris to develop sepsis. At trial, it was undisputed that it would be possible for Mr. Harris to develop sepsis within a matter of hours. When Mr. Harris presented to the KC

11

Case 4:18-cv-00424-BP   Document 79   Filed 02/14/20   Page 11 of 15

VAMC urology clinic, he had no signs or symptoms of a urinary tract infection ("UTI"). P.A. Cernich, the provider from the urology clinic who examined Mr. Harris, testified that she observed no signs or symptoms of a UTI. Furthermore, she would have documented such symptoms if they had been present. As stated above, this examination occurred around 1:00 p.m. By 6:00 p.m., NRMC had diagnosed Mr. Harris with sepsis.

In addition, after P.A. Cernich assessed Mr. Harris and found no evidence of a UTI, the balloon was inflated in Mr. Harris' urethra. This caused sufficient trauma that resulted in bleeding, not only through the catheter and into the bag, but also outside the catheter and the tip of Mr. Harris' penis. The bleeding was so significant that at 3:15 p.m., 100cc's of blood was drained. Frank blood again filled the bag around 6:00 p.m. at NRMC. As described by Plaintiff's experts, significant trauma opened the blood vessels to allow bacteria to enter the blood stream and led to the sepsis that was diagnosed within hours.

Defendant's experts attempted to provide alternative explanations for how a patient might develop sepsis. However, the evidence is clear that Mr. Harris would not likely have developed urosepsis in the absence of the trauma caused by the negligently placed balloon. Plaintiff's experts provided extensive testimony regarding the causal connection between the urethral trauma and subsequent sepsis. This connection is also noted multiple times in the KC VAMC records during Mr. Harris' admission from May 13 through May 16, 2016. The evidence is also clear that Mr. Harris died from sepsis.

Defendant presented evidence alluding to a failure to act by Medicalodges and NRMC. However, under Missouri law, fault may be apportioned only among those that are parties. *Fahy v. Dresser Indus. Inc.*, 740 S.W.2d 635, 641 (Mo. banc 1987); *Rafter v. Riggs,* 792 S.W.2d 68, 69 (Mo. Ct. App. 1990). Thus, the only relevance of fault by Medicalodges, NRMC, or any other

12

non-party would be if such conduct was the "sole cause." *See Beverly v. Hudak*, 545 S.W.3d 864, 876-77 (Mo. Ct. App. 2018) ("Thus, a defendant may argue that a third party, including a non-party, was the *sole* cause of the plaintiff's injuries.") (emphasis in original). However, there is insufficient evidence in this case that any other entity's conduct was the sole cause.

Additionally, there was no evidence that Mr. Harris' family's decision to discontinue antibiotic treatment was an intervening cause of Mr. Harris' death. An intervening cause occurs when "a new and independent force . . . so interrupts the chain of events that it becomes the responsible, direct, proximate, and immediate cause of the injury, but it may not consist of an act of concurring or contributory negligence." *Simonian v. Gevers Heating & Air Conditioning, Inc.*, 957 S.W.2d 472, 475 (Mo. Ct. App. 1997). An intervening cause will not break the causal chain if it is merely a natural progression of events that were set in motion by the original negligent act. *Collins v. Missouri Bar Plan*, 157 S.W.3d 726, 732 (Mo. Ct. App. 2005). "An intervening cause will not preclude liability if it is itself a foreseeable and natural product of the original negligence." *Esmond v. Bituminous Cas. Corp.*, 23 S.W.3d 748, 753 (Mo. Ct. App. 2000) (quotations omitted); *see also SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 553 (Mo. Ct. App. 2016) ("An intervening cause is not foreseeable.").

The Eighth Circuit recently addressed these concepts and explained that:

> The intervening act must so interrupt the chain of events that it becomes the responsible, direct, proximate and immediate cause of the injury. The legal effect of this type of superseding event severs the connection between the original actor's conduct and the plaintiff's injury as a matter of law. Intervening acts must be so separate that they are not foreseeable consequences of an original act of negligence.

*Cottrell v. American Family Mut. Ins. Co.*, 930 F.3d 969, 972 (8th Cir. 2019) (applying Missouri law) (citations and quotations omitted).

13

As explained above, the evidence shows that Mr. Harris developed sepsis from urethral trauma. This trauma was caused by the negligent placement of the Foley catheter on May 12, 2016. Mr. Harris subsequently died as a result of sepsis. The family's treatment decision was done in consultation with Defendant and was not against medical advice. Any such decision does not constitute "a new and independent force which interrupts the chain of events initiated by the defendant's negligence in such a significant manner as to become the direct and proximate cause of the plaintiff's damages." *Collins*, 157 S.W.3d at 732 (quotations omitted). In fact, the witness testimony, both from KC VAMC physicians and expert witnesses, establish that the family's decision was reasonable and a foreseeable consequence of Defendant's negligence and Mr. Harris' sepsis.

## **Damages**

Evidence of damages was presented through family members and expert witnesses. All testified that Mr. Harris experienced significant pain and suffering as he progressed through the dying process from May 12 through May 26, 2016. Mr. Harris' wife and daughter also provided testimony explaining the closeness of their relationship to Mr. Harris, how close Mr. Harris was to his parents, and the significant loss they all experienced with the death of their husband, father, and son. Indeed, all heirs lived close to Medicalodges and visited Mr. Harris multiple times a week. Plaintiff requests a damages award of $761,558.00.

After considering the entire record in this case, the Court concludes that Plaintiff should be awarded $500,000.00. Consequently, judgment shall be entered in that amount.

## III. CONCLUSION

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that judgment shall be entered in favor of Plaintiff Patricia Harris and against Defendant United States of America in the amount of $500,000.00.

IT IS SO ORDERED.

DATE: February 14, 2020

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT